## CIRCUIT COURT OF THE CITY OF RICHMOND

Engineered Control Systems, Inc.

     v.

Federal Data Corporation

     v.

Energy Control Systems, Inc., et al.

November 3, 1982

Case No. Chancery G 6336-2

By JUDGE MARVIN F. COLE

In 1977, Energy Control Systems, Inc., ("Energy Control") was formed by Ken Shafer ("Shafer") and Andrew Harris ("Harris"). About a year later, Edward Shield ("Shield") and Ralph Franke ("Franke"), became principals in Energy Control. From then until now, each has been a one-fourth owner of the company, holding 25 percent of its outstanding stock. From the inception of Energy Control until June, 1979, Shafer was its vice-president and chief operating officer. He served as a director until October, 1979. Shield, Franke and Harris were, and continue to be, directors of the company, and from time to time they have been officers of Energy Control. Since June, 1979, Franke has been secretary of the company and Harris has been vice-president.

Energy Control was a licensed electrical contractor, who was in the business of designing, selling, installing and maintaining computer operated climate control systems. Energy Control also attempted to get into the business

of buying and reselling computer terminals to members of the Richmond Board of Realtors. That aspect of its business led Energy Control to Federal Data. One hundred terminals were to be bought by Energy Control and delivered to it by Federal Data over a several month period of time. Forty were delivered; nine were resold by Energy Control; thirty-nine were held by Energy Control for a short time and then returned to Federal Data. The project was abandoned by Energy Control with a substantial amount still owing to Federal Data pursuant to the purchase agreement between the parties.

Not having received payment of the amount due, Federal Data filed an action against Energy Control in this Court in March, 1980, for approximately $85,000. Steve Buis ("Buis") represented Energy Control in this action; Sandy Tucker ("Tucker") represented Federal Data. On several occasions throughout the course of the lawsuit Buis told Tucker that Energy Control could not afford to pay a judgment as great as $30,000 to $40,000, and that if it had to pay a judgment that large, Energy Control "would go out of business." Buis also told Tucker that bankruptcy of Energy Control might be required if it had to pay that much money.

Trial was had in this court before Judge Sheffield on November 19, 1980. Ken Shafer appeared as the corporate representative of Energy Control; he sat through the entire trial as such. He heard his counsel concede liability and admit that the only issues before the court related to computation of damages, whether Energy Control was entitled to a discount in the purchase price of the terminals and how interest was to be computed. He heard Judge Sheffield rule that Energy Control was entitled to a 12 percent discount, that Federal Data was to be awarded judgment on that basis, that a computation of interest was to be made using the guidelines recited by the Judge, and that a final order reciting the amount owed was to be prepared by counsel for Federal Data, transmitted to Energy Control's counsel for endorsement, and submitted to the court for entry. He knew on November 19, 1980, that the judgment entered from the bench and to be particularized in the written order was in the range of $40,000 to $45,000. Subsequently, a judgment was rendered in the amount of approximately $45,000.00. Therefore, on that day Shafer and the other owners of

Energy Control knew that Federal Data was not only its largest creditor but also its only judgment creditor.

Engineered Control Systems, Inc. ("Engineered") was formed on December 10, 1980, when its Articles of Incorporation were filed with the State Corporation Commission and its charter issued (see Defendant's Ex. 3). Shafer was Engineered's president, only stockholder, director and chief operating officer when it was incorporated. Shortly thereafter, he took John Fitzpatrick in as a shareholder, officer and director of Engineered. Fitzpatrick had been employed until then by Energy Control. Shafer also hired Darlene Southers and Kenneth White, employees of Energy Control until the end, to work for Engineered. There were only two other employees of Energy Control who did not continue with Engineered. One of them, Marla Hood, retired from employment altogether due to pregnancy.

Engineered was from the outset a distributor of Andover energy products. Engineered continued and finished several jobs begun by Energy Control. Engineered's office was at 2512 Grenoble Road, in the same space that Energy Control had occupied. The same equipment and inventory used by Energy Control were used by Engineered. It was never even moved in the transfer. Engineered, in effect, picked up where Energy Control left off, although its business thereafter apparently expanded somewhat under the control of Shafer.

It was to Engineered, then solely owned and controlled by Shafer, that Energy Control, owned by Shafer, Harris, Franke and Shield, sold its assets, as set out in Defendant's Ex. 5. The purchase price was $79,131.51, and paid, in part, by Engineered's assumption of Energy Control's liabilities, with one exception, the liability to Federal Data. The difference between the liabilities transferred and the purchase price, or $23,885.28, was paid to Energy Control by Engineered on December 6 and deposited to the account of Energy Control on December 8. The principals of Energy Control and Engineered met on December 6 to sign the documents of transfer and close out the business of Energy Control. Shafer purposely absented himself from the discussion among Harris, Franke and Shield as to how the only remaining asset of Energy Control, cash in the bank, was to be disbursed. However, he "assumed" that Federal Data might not be paid. On that very day checks were written to all but close out

the account of Energy Control. The company insiders got almost all of it: $5,000 to David Lee, Energy Control's president and a director of the company; $1,000 to Harris, its then vice-president, director and onefourth owner; $3,000 to Franke, its Secretary, director and one-fourth owner; $3,000 to Shield personally, a director and one-fourth owner; and $11,144.65 to United Leasing Corp., a company run by Shield, its president. The company's checkbook shows no other payments to Shield, Franke or Harris for the year 1980. These payments represented the return of money put into the company in 1978, after which there had been no demand on Energy Control for payment of the sums advanced. No notes of Energy Control for these sums were produced. Regular monthly payments had been made to United Leasing in the amounts of $109.75 and $188.39 for the entire year, but not until December, 1980, did Energy Control pay out such large sums to it.

The payments of $4,000 and $1,000 to David Lee were in consideration for termination of his one year employment agreement.

Since the transfer of assets and payout of funds, Energy Control has done no further business, and Engineered has carried on at the same location.

After first learning in March, 1981, of Energy Control's transfer of assets, Federal Data had a writ of fieri facias issued by this court, and it instructed the Sheriff of Henrico to levy upon all transferred items found in the possession of Engineered. In June, a levy was made on numerous items located at Engineered's offices at 2512 Grenoble Road. Many of the items levied on were not items transferred by Energy Control to Engineered. On the day of levy, Engineered sought and obtained from this court a temporary injunction against sale of the levied upon assets. A $20,000 bond was posted by Engineered conditioned upon Engineered's commitment to have the property levied upon "forthcoming to abide the further orders of this court."

Federal Data contends that the transfer of assets as set out in the agreement and bill of sale (Defendant's Ex. 5), was not in good faith and done for the purpose of hindering, delaying or defrauding Federal Data as a creditor of Energy Control and in violation of § 55-80 of the Code of Virginia, which states the following:

**55-80.** *Void fraudulent acts; bona fide purchasers not affected.* Every gift, conveyance, assignment, or transfer of, or charge upon, any estate, real or personal, every suit commenced or decree, judgment or execution suffered or obtained and every bond or other writing given with intent to delay, hinder or defraud creditors, purchasers or other persons of or from what they are or may be lawfully entitled to shall, as to such creditors, purchasers or other persons, their representatives or assigns, be void. This section shall not affect the title of a purchaser for valuable consideration, unless it appear that he had notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor.

Shafer ceased in the active role as an employee, officer, director, or agent of Energy Control as of October, 1980. After that point his interests and efforts were directed toward establishing himself in a new business that might or might not have involved Energy Control. His appearance as corporate representative at the trial of the Federal Data law suit on November 19, 1980, was brought about by the fact that he was cognizant of the events that had taken place and over which the suit was involved and, therefore, he was the logical person to act as the corporate representative.

The evidence is abundantly clear that the sale of the Energy Control assets to Engineered Control Systems, Inc., was for not only valuable consideration, but was for full and fair consideration. There is no evidence in this case to show that Engineered Control Systems, Inc. did not pay a full and fair consideration for the assets which it purchased. I am, therefore, of the opinion that this was not a fraudulent transfer under § 55-80 of the Code of Virginia. As a matter of fact, Energy Control was in a better condition after that sale than it was before. Prior to the sale it was hopelessly insolvent and was unable effectively to carry on its business. The sale of the assets would have permitted it to liquidate and pay to its creditors a large portion of their indebtedness, while to have continued to operate further would have carried them further in debt. The position of Energy

Control was enhanced by the transfer and the transfer was not detrimental to it in any way.

The plaintiff next contends that the transfer of assets as set out in the agreement and bill of sale violates the bulk sales act and is therefore void as to Federal Data. Title 8.6 of the Code of Virginia is the bulk transfer section of the Uniform Commercial Code. Section 8.6-102 defines those transfers subject to the penalty of this Title and sets forth various items which must be included in a bulk transfer. To constitute a bulk transfer the seller's principal business must be the sale of merchandise from stock and it has been held that a contractor does not come within the provisions of this section. I am of the opinion that Energy Control was a licensed electrical contractor and dealt in services. Therefore, he does not come under the definition of the Uniform Commercial Code which requires that in order to constitute a bulk transfer that the seller's principal business must be the sale of merchandise from stock. Therefore, I find no merit to the contention that the transfer of the assets violates the bulk sales law.

The plaintiff also contends that the transfer of the 1977 Volvo was not in good faith and was done to hinder, delay or defraud Federal Data. However, it is my opinion under the evidence in this case that it is established that the Volvo was owned by Shafer and that the vehicle was transferred to him since he was the owner of the vehicle and not for the purpose of hindering, delaying or defrauding creditors. The evidence is to the effect that Shafer paid for the vehicle and that it was not paid for by Energy Control.

The plaintiff further contends that the payment of the proceeds of the sale of assets of Energy Control to Shield, Franke, Harris and United Leasing were fraudulent. Federal Data recognizes United Leasing is not a party to this suit but submits that the court can order Shield, its president, to reconvey the corporate funds if necessary.

I am of the opinion that the case of *Darden v. Lee Company, Inc.*, 204 Va. 108 (1963), is dispositive of the issues in this case. In the *Darden* case the Supreme Court stated that the weight of authority seems to be that the directors of an insolvent corporation, who are also creditors of the corporation, have no right to grant themselves a preference or advantage over other creditors

in the payment of their claims. It seems clear to me that Shield, Franke, and Harris had complete control over this corporation when they transferred assets from the corporation to themselves and Lee and United Leasing and the payment was made to them in order that they might have an advantage over other creditors, and especially Federal Data. These transfers in my opinion were deliberate on their part and were intended to prevent any payment being made to Federal Data.

The evidence in this case indicates that $5,000 was paid to David Lee, Energy Control's president and a director; $1,000 was paid to Harris, its then vice-president and director; $3,000 to Franke, its secretary and director, and $3,000 to Shield, a director; and $11,144.65 to United Leasing Corporation, a company run by Shield, its president.

I am, therefore, of the opinion that Shield, Franke and Harris should return to the corporation the sum which they paid out, or a total of $23,144.65. It may be that they can get David Lee and United Leasing to put back into the corporation the money which they withdrew. However, in any event, Shield, Franke and Harris had complete control of the corporation and they were responsible for making the payments. Therefore, they are now responsible for returning that amount of money to the corporation.

As was done in *Darden v. Lee Company, Inc.*, the money then should be paid out of the corporation on a pro rata basis in accordance to the amount of the claims of each, including Federal Data.

In regard to the assessment of punitive damages, I have not been cited any competent authority to show in cases of this nature that punitive damages should be awarded. Therefore, I am not making any award for punitive damages. However, it appears to me that interest should be computed on all the figures that I have shown above. The legal rate of interest is 6% per annum and I suppose that the judgment entered by Judge Sheffield carries interest at the rate of 10% per annum. It would appear to me in computing the above figures, that interest should also be computed. On the other hand, it may be that you will want to leave interest off of all of the figuring in the computation since it will not make that much difference.